**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

NATIONAL UNION OF HEALTHCARE
WORKERS, SONIA ASKEW, ROBIN BLAKE,
LISA ENGLES, DANIELLE ESTRADA,
ANGELA GLASSER, ROBERT HERNANDEZ,
DAVID MALLON, TURUSEW WILSON, and
GEORGE WONG,

    Plaintiffs,

  v.

KAISER FOUNDATION HEALTH PLAN, INC.,
KAISER FOUNDATION HOSPITALS, THE
PERMANENTE MEDICAL GROUP, INC., and
SOUTHERN CALIFORNIA PERMANENTE
MEDICAL GROUP,

    Defendants.
                                  /

No. C 10-03686 WHA

**ORDER GRANTING
DEFENDANTS'
MOTION TO DISMISS**

**INTRODUCTION**

In this action for declaratory and injunctive relief regarding employers' payments of wages and benefits to campaigning union representatives during representation elections, employers move to dismiss plaintiffs' novel claims under the Labor Management Relations Act. After full consideration of the parties' briefs and a hearing, the motion to dismiss is **GRANTED**.

**STATEMENT**

Amid internal disputes over union governance, some officers of the Service Employees International Union-United Healthcare Workers broke away and formed a rival union, the

National Union of Healthcare Workers. Four years of court battles have ensued. This suit is one. *See also SEIU v. SEIU-UHW*, No. C 09-00404 WHA (N.D. Cal. 2010), *aff'd sub nom. SEIU v. NUHW*, No. 10-16549 (9th Cir. 2013). The two unions continue to compete to represent the approximately 45,000 Kaiser health-care workers in California.

The instant action was filed in mid-2010 in anticipation of a representation election. The election was ordered by the National Labor Relations Board for the employees of defendants Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, The Permanente Medical Group, Inc., and Southern California Permanente Medical Group, all parties to a collective bargaining agreement with SEIU-UHW. In the run-up to the election, NUHW and nine Kaiser employees filed this action, seeking to enjoin Kaiser from, among other things, providing wages or benefits to SEIU-UHW members for time spent campaigning for SEIU-UHW. The complaint alleged that Kaiser improperly favored SEIU-UHW by paying salaries or benefits to three categories of union reps — shop stewards, contract specialists, and "lost-timers" — while they campaigned for SEIU-UHW. Employers are supposed to stay out of union elections and let the workers decide who will represent them.

The 2010 election was held, and SEIU-UHW won. Immediately thereafter, NUHW filed objections with the Board, complaining about Kaiser's and SEIU-UHW's conduct during the election. The undersigned stayed this action pending the Board's opinion (Dkt. No. 23). In early 2011, NUHW also filed before the Board a charge that Kaiser had committed unfair labor practices in violation of Section 8(a) of the National Labor Relations Act. The unfair labor practices allegations before the Board tracked those of the complaint herein (in addition to other allegations). The Board declined to move forward with the Section 8(a) charges until the previously filed election objections were resolved. In July 2011, the Board determined that irregularities (unrelated to the allegations at issue here) had prevented a fair election and set aside the result. Finally, the Board issued an advice memo in November 2012 declining to act on NUHW's Section 8(a) charges (Dkt. No. 44, Exh. D). The undersigned then lifted the stay in the instant action, and Kaiser renewed an earlier motion to dismiss. The new election will be in April 2013 (Dkt. No. 53).

2

The gravamen of the complaint is that Kaiser violated Section 302(a) of the LMRA by continuing to provide wages or benefits to various categories of union reps for their time spent campaigning for SEIU-UHW. It seems true that Kaiser has and continues to pay salaries and benefits for union officials. This is because it agreed to do so in the collective bargaining agreement. That agreement requires Kaiser to provide wages and/or benefits for three categories of union reps. The first two are "shop stewards" and "contract specialists," who together are responsible for administering the collective bargaining agreement at the direction of the union. Their duties include processing employee grievances, training union reps, and attending investigatory meetings, among other things. Shop stewards and contract specialists continue to receive their salary and benefits for time spent attending to union business. Plaintiffs allege, and defendants do not dispute, that there are at least one thousand shop stewards and twenty to thirty contract specialists working in Kaiser California facilities. Another category of union staffers compensated by Kaiser includes "lost-timers." These are Kaiser employees who become paid staff members of the union after requesting up to a one-year unpaid leave of absence from Kaiser. Pursuant to the collective bargaining agreement, Kaiser continues to provide these lost-timers' benefits and accrued leave (but not salary) during the time away. Plaintiffs allege that in August 2010, there were approximately 20 lost-timers assigned to Kaiser California facilities and that Kaiser had plans to grant lost-timer status for approximately four hundred additional Kaiser employees in preparation for the then-upcoming union elections.

The basic question is whether Section 302 bars an employer from funding union staffers in whole or in part to work on representation campaigns to the detriment of a rival union.

**ANALYSIS**

1. **PLAINTIFFS' STANDING.**

Section 302(e) of the LMRA provides: "The district courts of the United States . . . shall have jurisdiction, for cause shown, . . . to restrain violations of this section." The Supreme Court observed in dicta that Section 302(e) permits "private litigants to obtain injunctions in order to protect the integrity of employees' collective bargaining representatives in carrying out their responsibilities." *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 205 (1962), *abrogated on*

3

*other grounds, Boys Markets, Inc., v. Retail Clerks Union, Local 770*, 398 U.S. 235 (1970). The Supreme Court went on to note:

> [t]hat this section, which stands alone in expressly permitting suits for injunctions previously proscribed by the Norris-LaGuardia Act to be brought in the federal courts by private litigants under the Taft-Hartley Act, deals with an unusually sensitive and important problem is shown by the fact that [Section 302] makes the conduct so enjoinable a crime punishable by both fine and imprisonment.

*Ibid.*, n.19. For decades, our court of appeals has followed this understanding of Section 302(e). The private right of action is limited to claims for injunctive relief. *See Toyota Landscaping Co., Inc. v. S. Cal. Dist. Council of Laborers*, 11 F.3d 114, 117–19 (9th Cir. 1993); *Souza v. Trs. of W. Conference of Teamsters Pension Tr.*, 663 F.2d 942, 945 (9th Cir. 1981).

Based on two more recent Supreme Court holdings limiting implied private rights of action, however, Kaiser argues that district courts can no longer hear claims brought under Section 302 by private parties, even those brought for injunctive relief. *Alexander v. Sandoval*, 532 U.S. 275 (2001), addressed a statutory directive to agencies to effectuate provisions of Title VI. A driver's license applicant brought suit against a state transportation agency because it had a policy to provide the license application only in English. She contended this policy violated federal regulations that prohibited agencies receiving federal funding from using methods that have discriminatory disparate impacts. *Sandoval* concluded that Section 602 of the Civil Rights Act lacked "rights-creating" language, focused on providing direction for the regulating agencies rather than focusing on the individuals protected or the agencies being regulated, and expressly restricted agency enforcement. In sum, there could be no private right of action to enforce disparate-impact regulations promulgated under Title VI, even when the regulations contained rights-creating language, as long as the statute *itself* lacked such language. The opinion explicitly approved the Supreme Court's earlier finding of an implied private right of action in Section 601 of the same Act in *Cannon v. University of Chicago*, 441 U.S. 677 (1979).

Kaiser directs us to some language in *Sandoval* that signals the Supreme Court's withdrawal from freely implying private rights of action in order to effectuate presumed Congressional intent: "Having sworn off the habit of venturing beyond Congress's intent,

4

we will not accept respondents' invitation to have one last drink." *Sandoval*, 532 U.S. at 287. The problem is, as far as Section 302 is concerned, our appellate courts have already had that drink. It has been long accepted that the text of Section 302 itself, rather than any regulation interpreting the statute as in *Sandoval*, contains rights-creating language.

Kaiser also suggests that Section 302's private right of action was abrogated by the holding of *Gonzaga University v. Doe*, 536 U.S. 273 (2002). In *Gonzaga*, a former student sued the university under 42 U.S.C. 1983, alleging a violation of a provision of the Family Educational Rights and Privacy Act that limited disbursement of federal funds to schools that had lenient student-record-release policies. The Supreme Court held that spending legislation drafted in terms like FERPA's cannot confer individual rights. As in *Sandoval*, the statute at issue lacked rights-creating language. Instead, the Act spoke in terms of the duties of the Secretary of Education, and did not refer to the interests of the students and parents to be protected. It thus failed to create the sort of "individual entitlement" enforceable under Section 1983. *Id.* at 274–75. In contrast, LMRA Section 302's language directly applies to the parties it intended to protect and regulate, rather than focusing on the regulator, as in *Sandoval* and *Gonzaga*.

If *Sandoval* and *Gonzaga* somehow vacated an entire body of entrenched law under Section 302, then that proposition will have to be announced by higher authority. This order must go with the prevailing law and holds that plaintiffs have standing to bring this action.

**2. SECTION 302.**

Section 302(a) of the LMRA provides:

> It shall be unlawful for any employer . . . to pay, lend, deliver, or agree to pay, lend, or deliver, any money or other thing of value—
>
> (1) to any representative of any of his employees who are employed in an industry affecting commerce; or
>
> (2) to any labor organization, or any officer or employee thereof, which represents . . . any of the employees of such employer who are employed in an industry affecting commerce.

Collective bargaining agreement terms like the ones at issue here, requiring employers to pay union reps for time doing union work, would at first glance appear illegal under Section 302(a).

5

1    But courts have long accepted that one of Section 302(c)(1)'s two exceptions may legitimize
2    such arrangements:

3    > The provisions of this section shall not be applicable . . . in respect
4    > to any money or other thing of value payable by an employer:
5    > to any of his employees whose established duties include acting
6    > openly for such employer in matters of labor relations or personnel
7    > administration; or
8
9    > to any representative of his employees, or to any officer or
10   > employee of a labor organization, who is also an employee or
11   > former employee of such employer, as compensation for, or by
12   > reason of, his service as an employee of such employer.

(punctuation added).

### A. Shop Stewards and Contract Specialists.

Our court of appeals has upheld collective bargaining agreement terms that require an employer to provide ongoing wages and benefits to union reps analogous to the shop stewards and contract specialists here. *Int'l Ass'n of Machinists & Aerospace Workers, Local Lodge 964 v. BF Goodrich Aerospace Aerostructures Grp.*, 387 F.3d 1046 (9th Cir. 2004). In *Goodrich,* the shop steward, a twenty-year mechanic, took a full-time position representing employees' interests in the grievance process. Although he maintained his former job classification, he no longer performed mechanics' work. The shop steward sued the employer because it refused to assign him overtime work as a mechanic. The employer argued that the entire arrangement violated Section 302. *Goodrich* held that because the union rep's services as an employee provided the employer a legitimate benefit, the contractual provision requiring the employer to continue to compensate the union rep was proper because it fell under one of Section 302(c)(1)'s exceptions.

*Goodrich* examined whether the *entire contractual arrangement* allowing employers to pay certain union reps was legal, not whether compensation for specific activities was lawful. At issue here, in contrast, is whether it is illegal for an employer to continue to compensate union reps per the employer's contractual obligations, even though some of the reps' time might be spent campaigning for an incumbent union. Nevertheless, this order finds that *Goodrich* controls, at least as far as the shop stewards and the contract specialists. Its rationale applies here: By "play[ing] an integral role in enforcing the terms of the collective bargaining

6

agreement and in peacefully resolving disputes between labor and management," union reps like shop stewards and contract specialists provide a legitimate benefit to both union and employer. *Id.* at 1057.

The complaint suggests that Kaiser should supervise the union reps to make sure their activities are limited to those contained in the collective bargaining agreement. Taken to its logical endpoint, that argument would require Kaiser to detect when the union reps were, for example, surfing the internet while on duty, then dock their pay for those wasted minutes. Generally, the inquiry must focus more on the employer's intent at the time of entering the agreement than at the time of compliance with its terms. This order finds that, as to the shop stewards and contract specialists, Kaiser's motion to dismiss must be **GRANTED**.

### B. Lost-Timers.

For the first time in their opposition, plaintiffs appear to argue that the overall contractual arrangement requiring Kaiser to maintain benefits for lost-timers on union leave might be illegal (Br. at 12–14). *Goodrich* declined to consider the legality of conceptually similar "paid union leave" arrangements under Section 302, and our court of appeals has not otherwise addressed this issue. *Id.* at 1059. Our sister circuits have reached varying conclusions. *Compare Caterpillar, Inc. v. Int'l Union, UAW*, 107 F.3d 1052 (3d Cir. 1997) (paid union leave legal if contained in a collective bargaining agreement) and *United States v. Phillips*, 19 F.3d 1565 (11th Cir. 1994) (paid union leave legal if benefits vested before employee left employer's service) *with BASF Wyandotte Corp. v. Local 227, Int'l Chem. Workers Union*, 791 F.2d 1046 (2d Cir. 1986) (stating in dicta that paid union leave was illegal) and *NLRB v. BASF Wyandotte Corp.*, 798 F.2d 849 (5th Cir. 1986) (same). In any case, the opposition is not the proper arena in which to raise a critical new legal theory. Plaintiffs should have addressed this proposition in the complaint if they intended to base part of their case on it. This order will not salvage the pleading based on the contents of the briefing and therefore will not reach the overall legality of contract terms providing for lost-timers to take employer-compensated leave.

The complaint's main allegation is that Kaiser violated Section 302 by providing benefits to lost-timers *in this factual context*, where Kaiser may have intended to allow a

7

geometric increase in lost-timer leaves of absence in the run-up to the 2010 election — from twenty to over four hundred. The terms of the instant collective bargaining agreement regarding lost-timers are bare-bones: They merely provide that employees may apply to take up to a one-year leave to work for the union, during which time their benefits and seniority continue to accrue (*see* Dkt. No. 44, Exh. A). Most payment arrangements entered into in a collective bargaining agreement are presumed to be openly and fairly negotiated for, and thus would not implicate the type of bribery Section 302 is meant to prevent. But if contractual terms regarding lost-timers were vague enough that they could be fleshed out by custom and usage in a way that implicated improper influence by an employer, then the employer's conduct might be found to violate Section 302. Absent specific allegations regarding any such course of conduct, however, Kaiser's motion to dismiss must be **GRANTED**.

## CONCLUSION

For the foregoing reasons, Kaiser's motion to dismiss is **GRANTED**. Plaintiffs may seek leave to amend the complaint and will have until **APRIL 29, 2013**, to file a motion, noticed on the normal 35-day track, for leave to file an amended complaint. A proposed amended complaint must be appended to the motion. Plaintiffs should plead their best case, which must be limited to lost-timers *only*. The motion should clearly explain how the amendments to the complaint cure the deficiencies identified herein, and should include as an exhibit a redline or highlighted version identifying all changes. If such motion is not filed by the deadline, this case will be closed.

**IT IS SO ORDERED.**

Dated: April 15, 2013.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

8