IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

NATIONAL UNION OF HEALTHCARE
WORKERS; SONIA ASKEW; ROBIN BLAKE;
LISA ENGLES; DANIELLE ESTRADA;
ANGELA GLASPER; ROBERT HERNANDEZ;
DAVID MALLON; TURUSEW WILSON and
GEORGE WONG,

    Plaintiffs,

  v.

KAISER FOUNDATION HEALTH PLAN, INC.;
KAISER FOUNDATION HOSPITALS; THE
PERMANENTE MEDICAL GROUP, INC;
SOUTHERN CALIFORNIA PERMANENTE
MEDICAL GROUP,

    Defendants.

No. C 10-03686 WHA

**ORDER DENYING
DEFENDANTS'
MOTION FOR
SUMMARY JUDGMENT**

## INTRODUCTION

Posed is a question of first impression under the Labor Management Relations Act, namely under what circumstances, if any, an employer may continue paying benefits for employees given leave to go work for the incumbent union against a rival union in a representation election. Defendants move for summary judgment. For the reasons stated below, and in light of genuine issues of material fact, the motion is **DENIED**.

## STATEMENT

Amid internal disputes over union governance, some officers of the Service Employees International Union-United Healthcare Workers broke away and formed a rival union, the

National Union of Healthcare Workers ("NUHW"). Four years of court battles have ensued. This suit is one. *See also SEIU v. SEIU-UHW*, No. C 09-00404 WHA (N.D. Cal. 2010), *aff'd sub nom. SEIU v. NUHW*, No. 10-16549 (9th Cir. 2013).

The main question for resolution is under what circumstances, if any, an employer violates Section 302 of the Labor Management Relations Act by paying benefits (but not wages) to and allowing time to accrue toward retirement for union representatives engaged in campaign activities against a rival union in a union representation election.

Defendants Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, The Permanente Medical Group, Inc., and Southern California Permanente Medical Group (all "Kaiser") were (and still are) parties to a collective bargaining agreement with Service Employees International Union-United Healthcare Workers ("SEIU-UHW"). That agreement required Kaiser to continue to provide benefits for "lost-timers." Lost-timers were regular Kaiser employees who became paid staff members of the union after requesting up to a one-year unpaid leave of absence from Kaiser to "conduct union business" (Diaz Decl. ¶ 3; Diaz Exh. C at 123). Pursuant to the collective bargaining agreement, Kaiser continued to provide these lost-timers' benefits and accrued leave (but not wages) during time spent working full-time for the union.

While the lost-timer provision did not define "union business," a trier of fact could reasonably conclude that the intent of the parties negotiating the collective bargaining agreement was that the work would be restricted to traditional contract administration and joint labor-management activities (Malkani Exh. 1 at 107–112). From 2005 to 2009, for example, the scope of duties was limited to work on joint union-Kaiser projects, under the supervision of Kaiser, not SEIU-UHW, and in the interests of Kaiser, not solely SEIU-UHW (*id*. at 42–43, 90, 108–12). *Significantly, no lost-timer ever engaged in campaigning for SEIU-UHW until Kaiser released employees to campaign for SEIU-UHW during SEIU-UHW's campaign against NUHW in 2010.* When a few employees were earlier released to work on the 2008 United States presidential campaign, Kaiser did not pay their benefits while on leave (*id*. at 93). So by custom and usage, a good argument can be made (and is made) that the intended scope of the lost-timers

2

1  provision was not meant to be expansive and the number on such leave would be few
2  (*id.* at 80–81).

3       In 2009, however, a group of former officers of SEIU-UHW broke away and formed a
4  rival union, NUHW. In 2010, the National Labor Relations Board ordered a union
5  representation election. Following several objections filed by NUHW, the Board set aside the
6  election results and set a re-run election between SEIU-UHW and NUHW to commence in May
7  2013 (Dkt. No. 100).

8       During SEIU-UHW's representation campaigns against NUHW, SEIU-UHW
9  used many more employees on lost-time from Kaiser to campaign against the upstart rival.
10 Those employees continued to receive benefits from Kaiser (but not wages) while working for
11 the old union to stave off the new one. Kaiser admits that there were a total of seven lost-timers
12 working for the union in 2009, a year before the election (Cordova Decl. ¶ 8; Scannel Decl. ¶ 9).
13 Kaiser further admits that number grew to forty-five in 2010, the election year, but argues
14 that the growth had to do with reasons in addition to the election, such as a new leadership at
15 SEIU-UHW that lacked the staffing to "resolv[e] grievances . . . handl[e] disputes" and perform
16 the "day to day operation of the [collective bargaining agreement]" (*ibid.*; Dkt. No. 95, Exh. B
17 at 2699).

18      The new rival union, our plaintiff herein, claims the actual increase was even more
19 dramatic. It submits evidence that at least 160 lost-timers were operating for SEIU-UHW
20 during the 2010 election period (Siegel Decl. ¶ 6; Malkani Exh. 3). NUHW claims that Kaiser
21 knowingly released lost-timers to SEIU-UHW to campaign against NUHW and paid them
22 benefits, including health, dental and other medical benefits; vacation and life insurance benefits;
23 credited service toward the pension plan for the duration of the leave; and accruals of seniority
24 and leave (Diaz Exh. C at 123).

25      NUHW, the new rival, commenced this action in August 2010, alleging that Kaiser
26 violated Section 302(a) of the Labor Management Relations Act by paying the benefits of
27 several categories of SEIU-UHW union members while they campaigned against NUHW during
28 the elections that would determine which union would represent Kaiser's employees. Only after

3

this action was underway did SEIU-UHW begin to make payments to reimburse Kaiser for the benefits.

This action was stayed by order dated November 19, 2010, pending a decision by the Board concerning the same conduct under the NLRA. After the stay was lifted, Kaiser moved to dismiss. The motion was granted with respect to two categories of workers: shop stewards and contract specialists. NUHW filed a motion for leave to amend, narrowing its allegations so as to focus solely on the campaign activities of the lost-timers. That motion was granted (Dkt. No. 68).

Kaiser now moves for summary judgment, arguing that, as a matter of law, there was no violation of Section 302 of the Labor Management Relations Act (Dkt. No. 95). Genuine issues of material fact, however, preclude summary judgment, as now explained. This order follows full briefing and oral argument.

**ANALYSIS**

**1.   SECTION 302.**

Section 302(a) of the Labor Management Relations Act provides:

> It shall be unlawful for any employer . . . to pay, lend, deliver, or agree to pay, lend, or deliver, any money or other thing of value —
>
> (1) to any representative of any of his employees who are employed in an industry affecting commerce; or
>
> (2) to any labor organization, or any officer or employee thereof, which represents . . . any of the employees of such employer who are employed in an industry affecting commerce.

29 U.S.C. 186(a).

Collective bargaining agreements requiring employers to pay union representatives for time doing union work would, at first blush, appear to violate Section 302(a). There are, however, several exceptions applicable to Section 302(a). Among them is Section 302(c)(1), which renders Section 302(a) inapplicable:

> [I]n respect to any money or other thing of value payable by an employer to . . . any representative of [its] employees, or to any officer or employee of a labor organization, who is also an employee or former employee of such employer, as compensation for, or by reason of, his service as an employee of such employer.

4

The gravamen of this lawsuit is that under Section 302, it was unlawful for Kaiser to pay benefits to, or lend money to, its lost-timer employees, while such representatives were "under the complete direction and control of SEIU-UHW and not Kaiser," and were campaigning against NUHW, a rival union, in connection with a union election (Amd. Compl. 2).

No circuit decision has examined the issue presented. All of the precedents cited involved a dispute between an employer and a union. By contrast, here we have a scenario in which the employer has given aid and comfort to one union with whom it is friendly in its fight to stave off a second, rival union from seeking to represent the workers — or so a reasonable trier of fact could find on this record.

Section 302 is an anti-corruption provision intended to prevent acts such as bribery of employee representatives by employers, extortion by employee representatives, and possible abuse of power by union officials. 29 U.S.C. 141; *Arroyo v. United States*, 359 U.S. 419, 425–26 (1959).

In determining whether Kaiser's actions are the type prohibited by Section 302 of the LMRA, or whether they are permissible under the Section 302(c)(1) exception, our court of appeal's decision in *Goodrich* is important. *Machinists Lodge 964 v. BF Goodrich Aerospace*, 387 F.3d 1046 (9th Cir. 2004) ("*Goodrich*"). *Goodrich* concerned the legality of a collective bargaining agreement that called for the employer to pay the salary and benefits of a "chief shop steward" who continued to draw his salary and benefits while working primarily on the investigation and prosecution of union grievances. *Id*. at 1047. *Goodrich* held that the collective bargaining provision fell within the safe harbor of Section 302(c)(1). Our court of appeals accepted the "core" of the union's argument, which was that the shop steward should be excepted because he served (1) subject to the employer's control, and (2) in the interests *of the employer* by playing an integral role in enforcing the terms of the collective bargaining agreement and resolving disputes. *Id*. at 1057. In other words, the shop steward's compensation was attributable to his "*service*" to the employer. *Ibid*. (emphasis added). *Goodrich* also noted that Section 302(c)(1) was not available to save instances in which the employee simply remained

5

on the company's payroll. Specifically, "Section 302(c)(1) legalizes payments to current or former employees based on their 'services' as employees, not their 'status' as such." *Ibid*.

Here, the services being challenged are the campaign activities, within a union representation election, of lost-timers. NUHW claims that Kaiser "released an army of lost-timers to campaign for SEIU-UHW," Kaiser's alleged favored union, and against NUHW (Opp. 4). Kaiser allegedly exponentially increased the number of lost-timers in order to sway the election. *NUHW presents evidence that the number of lost-timers asking for reimbursements during the 2010 election was over 160* (Siegel Decl. ¶ 6; Malkani Exh. 3). While Kaiser's own numbers differ, they still show that the number of lost-timers soared from seven to 45 in the election year of 2010. After the election, the number plummeted to seventeen and four in the next two calendar years, even by Kaiser's count. In the re-run election year of 2013, however, the number rebounded back up to 25 (Cordova Decl. ¶ 8; Scannel Decl. ¶ 9). While a factual dispute remains as to how many lost-timers campaigned, it is undisputed that SEIU-UHW substantially boosted their numbers before each critical election.

Unlike the chief shop steward in *Goodrich*, the actual services provided by these lost-timers cannot be construed as providing a legitimate benefit to the employer. The lost-timers worked completely under SEIU-UHW's direction and provided no legitimate service to Kaiser. In fact, the only logical benefit to Kaiser in flooding the campaign with lost-timers working for SEIU-UHW would be the defeat of NUHW, a union that Kaiser allegedly feared and disfavored.

A reasonable trier of fact could find that Kaiser wanted to keep the old, soft union with whom it could "do business" and defeat the new, tough union that planned to protect the workers more aggressively. Domination or interference with the formation or administration of a union is precisely one of the evils the LMRA was designed to prevent.

Kaiser further argues that because its lost-timers were only paid benefits, not wages, there was no violation. They cite to the recent Seventh Circuit decision *Titan Tire Corp. of Freeport, Inc. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 734 F.3d 708 (7th Cir. 2013). There, as in *Goodrich*, a court of appeals examined the issue of whether an employer could pay the full salary of union representatives who were former

6

1 employees. The court held that "paying the full-time union salaries . . . is so incommensurate
2 with their former employment as not to qualify as payments in compensation for or by reason of
3 employment." *Id*. at 712. Therefore, while the court explicitly did not rule on the issue of paying
4 benefits — "[Employer] does not contend that it is illegal for it to continue providing fringe
5 benefits or to allow [union representatives] to retain their seniority, as required by the labor
6 agreement, and the legality of such provisions are not before us on appeal" — it did, however,
7 note that "courts have uniformly concluded that the 'by reason of' exception of 302(c) allows
8 union workers to receive fringe benefits earned *during their prior service to an employer*."
9 *Id*. at 722 (internal citations omitted) (emphasis added). Here, by contrast, the benefits were for
10 ongoing work for the union and not for prior services.

11 According to *Titan*, what is important "is whether the recipient has a right to the payment
12 before he or she leaves the company, not the date on which the payment is actually made or
13 received." *Titan*, 734 F.3d at 722. While a union representative's right to a full-time salary
14 vests only after he stops working for the company, "*some* fringe benefits . . . [vest] prior to the
15 employee taking the leave, and the right to receive the benefits does not depend on the quantity
16 or quality of future services." *Ibid*. (emphasis added).

17 This order must apply our own circuit's test and not the Seventh Circuit's test, but both
18 would seem to come out the same way on this record.

19      **2.**     **FURTHER FACTUAL DISPUTES.**

20 Kaiser raises several additional arguments as to why summary judgment is appropriate:
21 *First*, Kaiser contends that it did not provide anything of value to SEIU-UHW because the union
22 agreed to reimburse Kaiser for the costs of the benefits provided to employees working for the
23 union during their leave of absence (Br. 10). Kaiser's argument hinges upon the language of
24 Section 302, which makes it unlawful for an employer to "pay, lend, deliver, or agree to pay,
25 lend, or deliver, *any money or other thing of value*." 29 U.S.C. 186(a) (emphasis added).
26 Kaiser cites the recent decision of *California Nurses Ass'n v. Good Samaritan Hosp., L.P.*,
27 No. 11-02142, 2012 WL 4344551, *7 (N.D. Cal. Sept. 20, 2012) (Magistrate Judge Howard
28 Lloyd), for the proposition that where a union reimburses an employer for the wages and benefits

7

1  the employee earns while conducting union business, and there is no net expense to the employer,
2  the arrangement does not violate Section 302.  The letter of understanding at issue in
3  *Good Samaritan*, however, contained a reimbursement provision providing that the union
4  must reimburse the employer within thirty days of any wages or benefits expended on an
5  employee doing union work.  The court specifically noted that if the union failed to reimburse
6  the hospital within thirty days, "then defendant will have no obligation to honor the [letter of
7  understanding] until the union is current on its payments to the hospital."  *Id*. at 6.

Here, the collective bargaining agreement contained no such reimbursement provision:

> Benefits While on Union Leave.
>
> All Employer-paid benefits, including Performance Sharing
> Program (PSP), and paid time off accruals will be
> continued during a Union Leave of Absence.  During such
> leave the Employee will continue to accrue seniority.

(Diaz Exh. C at 123).  Mr. Simoes, the Kaiser division director for SEIU-UHW, testified that he did not believe the union was required to reimburse the lost-timers' benefits under the collective bargaining agreement (Dkt. No. 100, Exh. B at 3012).  Furthermore, NUHW argues that there is no evidence that any reimbursement was provided to Kaiser by SEIU-UHW in 2010 prior to the date of the commencement of this action.  Some of the lost-timers had been campaigning for several months without Kaiser sending any bills or invoices to SEIU-UHW asking for reimbursement (Krasilnikoff Decl. ¶ 48).  Kaiser further admits that not all benefits have been fully repaid (Lombard Decl. ¶ 12).  NUHW alleges that "more than $150,000 worth of benefits provided to [lost-timers] that have been paid for by Kaiser" have not yet been reimbursed (Krasilnikoff Decl. ¶ 46).  Thus, Kaiser's argument that it did not pay, lend, or deliver something of value to the lost-timers is destroyed by the fact that the union failed to fully reimburse the employer, or so it must be presumed on this summary judgment record.

*Second*, Kaiser contends that it provided lost-timer benefits to both unions on the same terms (Br. 13).  Kaiser alleges that NUHW has "unclean hands" because it took advantage of the very practice that it objects to in this action.  NUHW admits that it, too, sought and obtained union-related leaves of absence during the 2013 election (but not the 2010 election) for at least seven workers.  It further admits that at least five of its seven lost-timers engaged in campaign

8

activity for NUHW (Curtis Decl. ¶ 9). While NUHW clearly had many fewer lost-timers on its side during the election, Section 302's restrictions must, of course, apply with equal force to both unions. Should unclean hands apply? It is not so clear. Congress wanted to end corruption in the form of companies making payoffs to unions. Can a company escape this prohibition by making payments to both competing unions? To allow this loophole would undermine the goal of Congress. By analogy, it would be like excusing violations of campaign contribution limits because the contributor gave to both sides. On the other hand, inequitable conduct on the part of NUHW may arguably undermine its claim for relief. Without the benefit of a full trial, however, the record is not complete enough to make such a determination. Accordingly, the issue of Kaiser's unclean hands will not be settled by summary motion.

*Third*, Kaiser contends that when the collective bargaining agreement was entered into in 2005, there were "approximately 45 other unions and locals" that were also members to the agreement (Br. 2). According to Kaiser, these other unions constitute indispensable parties in relation to this action, and "must be joined for this Court to issue any order changing the parties' rights under the [collective bargaining agreement]" (*id*. at n.4). Were this order to alter the terms of the collective bargaining agreement, perhaps Kaiser would be correct. At most, however, we will be divining the meaning of the agreement, not changing it.

*Fourth*, on November 30, 2012, the Board's Division of Advice issued a memorandum concluding that Kaiser "did not provide unlawful financial assistance with respect to such lost-timer contributions and accruals, assuming arguendo that lost-timers engaged in pro-SEIU campaigning" (Dkt. No. 44, Exh. D). The Board's memorandum interpreted Section 8(a)(1) of the NLRA, which forbids an employer:

> [T]o interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7. Any prohibited interference by an employer with the rights of employees to organize, to form, join, or assist a labor organization, to bargain collectively, to engage in other concerted activities for mutual aid or protection, or to refrain from any or all of these activities, constitutes a violation of this section.

*Ibid*. Our court of appeals has said that "the NLRB's refusal to issue a complaint is not a final decision on the merits of the underlying issue and thus may not be given res judicata or collateral

9

estoppel effect when a subsequent claim for relief is made in the courts under the [LMRA] or the [LMRDA]." *Pagel, Inc. v. Teamsters Local Union 595*, 667 F.2d 1275, 1280 n.12, 13 (9th Cir. 1982). Even Kaiser does not contend that the advice memo collaterally estopped NUHW from pursuing its Section 302 action. It does argue that this Court has a "duty to harmonize [S]ection 302 with the NLRA" (Reply Br. 9). For the purposes of this action, the Board's advice memo is not controlling. Its brief discussion of Section 302 included analysis of DC Circuit and Seventh Circuit decisions, but does not mention this circuit's precedent. Further, NUHW argues that it "subsequently withdrew its charges before there was any refusal to issue a complaint," raising the possibility that NUHW did not receive a full hearing before the Board (Dkt. No. 45). *In addition, the advice memo stated that, "the Section 302 issue is currently the subject of a federal court lawsuit between the parties, and it is more appropriately addressed in that forum."* *Id*. at 3–4 n.9 (emphasis added). Accordingly, this Court will not cut short its own analysis before a full trial.

   *Fifth*, Kaiser resurrects an argument from its motion to dismiss, arguing that district courts can no longer hear claims brought under Section 302 by private parties, even those brought for injunctive relief. As stated in a prior order, if the prior entrenched law under Section 302 has been reversed, "then that proposition will have to be announced by a higher authority" (Dkt. No. 59). This order, in agreement with the prevailing authority, holds that NUHW has standing to bring this action.

   **3.**  **JUDICIAL NOTICE.**

   Kaiser requests judicial notice of: (1) the Board's advice memorandum; (2) an excerpt of the official report of proceedings before the Board's Region 32 in the above titled matter; and (3) the oral argument transcript in *Unite Here Local 355 v. Mulhall*, 134 S. Ct. 594 (Dec. 10, 2013) (Dkt. Nos. 95-2, 113). NUHW requests judicial notice of: (1) Administrative Law Judge Lana H. Parke's Report and Recommendation on Objections; and (2) excerpts from the Official Report of Proceedings before the Board, Region 32. Courts may take notice of records of court filings, judgments, administrative bodies, and other matters of public record. *United States v. 14.02 Acres*, 547 F.3d 943, 955 (9th Cir. 2008). Because these items are sources

whose accuracy cannot reasonably be questioned, judicial notice as to the existence of these documents, though not the facts contained within, is **GRANTED**.

## CONCLUSION

For the reasons stated above, Kaiser's motion for summary judgment is **DENIED**. The trial will commence as scheduled. The Court wishes to thank and to compliment the excellent counsel on both sides for their professionalism and candor concerning the facts and law.

**IT IS SO ORDERED.**

Dated: January 31, 2014.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE